**Dr. G. E. CEZEAUX et al., Appellants,**

v.

**Bob D. LIBBY, Appellee.**

**No. 7820.**

Court of Civil Appeals of Texas,
Beaumont.

July 15, 1976.

Rehearing Denied Aug. 5, 1976.

O. C. Lilienstern, Houston, for appellant.

Joseph D. Jamail, John Gano, Houston, for appellee.

STEPHENSON, Justice.

This is an action for damages for medical malpractice. Trial was by jury, and judgment was rendered for plaintiff on the verdict. The parties will be referred to here as they were in the trial court.

Plaintiff, Bob D. Libby, brought this suit against Dr. G. E. Cezeaux, and his partners, as defendants. The jury found that Dr. Cezeaux, individually and on behalf of his partnership, did not perform his medical services as a reasonably prudent anesthesiologist should have done in the exercise of ordinary care under the same or similar circumstances in (a) "failing to administer to Plaintiff an adequate dosage of proper anesthesia to insure unconsciousness and immobility during the surgery in progress"; (b) "failing to properly supervise the anesthetist nurse Schutter to see that she administered an adequate amount of dosage of proper anesthetic to insure that Plaintiff would remain unconscious and immobile during the surgery in progress"; and (c) "failing to detect that the Plaintiff was inadequately anesthetized and was, in fact, regaining consciousness in the midst of surgery." The jury also found that each of such acts of negligence was a proximate cause of plaintiff's injuries. None of those jury findings is attacked on this appeal.

The uncontradicted evidence shows the following occurred: Plaintiff suffered a detached retina in his right eye on July 1971, and surgery was performed reattaching the retina with a buckle. September 15, 1972, the surgery was performed to remove the buckle; it was out of this surgery that plaintiff received the injuries which made the basis of this suit. At a critical point in the surgery while the doctor had a needle in his eye making an injection, plaintiff moved down the table, raised up off the table, tore off the drapes * covering his face, tore out the sutures—all resulting in the injuries complained of which are described in more detail later. Dr. Cezeaux admitted on this trial that plaintiff moved during the sur-

gery because he was inadequately anesthetized.

█ The jury found plaintiff's damages to be in the amount of $500,000. Defendants' primary point of error is that the amount of such damages is excessive. This court has written at length on the subject of appellate review of this subject, in the majority and concurring opinions found in *Collins v. Gladden,* 466 S.W.2d 629 (Tex.Civ. App.—Beaumont 1971, writ ref'd n. r. e.). Reference is made to that case for our views as to the standards we should follow in reviewing monetary awards in suits for damages in cases involving personal injuries and allowances for pain and suffering.

The elements of damages which the jury was instructed it could consider were: his past physical pain; the physical pain which in reasonable probability he will suffer in the future; his past and future mental anguish, including disfigurement, humiliation, embarrassment and worry concerning his well-being; and his loss of earning capacity which in reasonable probability he will sustain in the future.

The evidence in this record supporting the award of $500,000 is as follows: Plaintiff's movement while the surgery was in progress and while the surgeon had a needle in his eye making an injection tore out the sutures in the drapes, tore the skin off of his eyelid, building up great shock pressure in the eyeball, rupturing the coat of the eye and hemorrhaging the eye. All of this resulted in a total loss of sight in such right eye.

The doctor attending plaintiff after this surgery testified: The condition of the right eye was very red and continued to worsen. When he first saw plaintiff after such surgery, plaintiff could see light, but by January 1973 the eye was completely blind. All through 1973 the eye continued to react, was red and inflamed. The eye was painful all during that time. By November of 1974 the eye was a hazy yellowish. The doctor became afraid of a sympa-

* Drapes are paper toweling which are sutured to the upper and lower eyelids so the surgery can be performed.

thetic ophthalmia disease, and the decision was made that it was best to remove the eye. "So, there was no sense in allowing him to continue with a blind painful eye, and a chance of losing his other eyesight from it." The right eye was removed (enucleated) in December 1974, and an Allen implant performed to accommodate an artificial eye made of plexiglass. Plaintiff was fitted with such a prothesis and tries to wear it. It irritates him, and he cannot wear it constantly. Plaintiff is embarrassed about the appearance of his right eye and of the mucous and tears which run down his cheek. Plaintiff is anxious and worries about having only one eye and having a job handicap. He has some pain in his eye which will continue the rest of his life. He will also have anxiety the rest of his life.

It was stipulated that a person forty-one years of age has a life expectancy of 30.7 years. Plaintiff testified as follows: He was forty-one years old when this surgery took place, and forty-four at the time of trial. He is a vice president of a general insurance company. After the retina was reattached, he could see with some limited vision, but he could perform his work and participate in his hobbies—golf, hunting, and fishing. The buckle began to cause him some irritation and pain; so, he returned for the surgery to remove the buckle. He was not aware of anything that happened in the operating room. His next recollection was the following morning when he was told it was time for breakfast. His eye was covered with a bandage, and a bloody fluid began seeping down his cheek. A doctor came into the room, removed and changed the bandage but did not tell him what had happened. Two days later defendant, Dr. Cezeaux, came into his room and told him about his moving on the operating table. He was in constant pain from the time of this operation until the eye was removed. The eye was a red color and angled out about fifteen degrees. He kept drops and medicine in it four times a day. He could distinguish light for a short time and then nothing. The eyelid drooped pretty badly. His work requires a great deal of reading, but he cannot read as he had in the past because of eyestrain on his left eye. The left lens in his glasses was changed to bi-focal, and he uses a magnifying glass to help him read. He tried playing golf but gave it up when he got a bug in his left eye. He also tried fishing but gave that up when he became afraid of getting a hook in his left eye. He does not drive a car at night and does not get on the highway anytime. He can't see to pass a car because he cannot judge distance. His wife goes on all trips with him. Since he has been trying to use the artificial eye, it causes him some pain and irritation. He cannot sleep with it inserted in his eyeball. He constantly worries about something happening to his left eye and about what would happen if he lost his present job. He sees the socket and the eyelid. There is scarring on the eyelid where it was torn, and there is a quarter inch gap in the upper eyelid where there are no eyelashes. He has recurring nightmares about waking up in the hospital room. He has had two pretty embarrassing situations while trying to wear the prothesis. He was in a meeting with the head of the data processing department of his company, when he brushed his eye with his hand, and it fell out on the floor. The other man just turned and walked away.

By way of summary, we consider all of the evidence before us, including the following: The fact that plaintiff has lost his right eye by enucleation; the physical pain and suffering, past and future, borne by plaintiff. According to his testimony supported by his doctor, he suffered constantly from the date of this operation, September 15, 1972 until December 1974; the fact that the use of the artificial eye causes him pain and irritation which his doctor says will continue the rest of his life.

Also considering the evidence as the mental anguish, past and future, including his disfigurement, humiliation, embarrassment and worry concerning his well-being; the testimony by plaintiff, also supported by his doctor, regarding the fact that he will have anxiety the rest of his life; also considering the evidence as to loss of earning capacity

in the future—we come to the conclusion that $500,000 is a reasonable sum and do not find it to be excessive. That point of error is overruled.

██ Defendants' remaining points of error complain that the presiding judge abused his discretion in assigning this case a special setting in violation of the local rules of the District Courts of Harris County. The complaint is also made that it was error not to strike the preferential setting or grant defendants' motions for continuance.

The record before us shows counsel for plaintiff filed a motion for preferential setting on the 10th of April 1975, asking for the setting for June 23, 1975. Such motion was heard April 14, 1975, and granted. No record was made at that hearing. Then May 14, 1975, counsel for defendant Cezeaux filed a "vacation letter" asking that the week of June 23, 1975, be designated as a vacation week for him. Then on June 23, 1975, such counsel filed the motion to strike the preferential setting and to grant a motion for continuance. Such motion was heard June 23, 1975, and overruled. No record of that hearing is brought before this court for review.

This case proceeded to trial on June 23, 1975. Defendants have made no effort to demonstrate that any harm resulted to them because this case went to trial. There is no suggestion that they were deprived of the testimony of any witness, or that they were unable to put on their defense in any respect.

From our study of the record before us there is no showing of abuse of discretion on the part of the presiding judge. In any event, there is no evidence of any error which was reasonably calculated to cause or probably did cause the rendition of an improper judgment. Tex.R.Civ.P. 434. Such points of error are overruled.

AFFIRMED.

Non-Concurring Opinion

KEITH, Justice.

Whether or not a judgment is excessive is a matter peculiarly within the jurisdiction of the Courts of Civil Appeals and is not reviewable by the Supreme Court. *Beaumont, S. L. & W. Ry. Co. v. Schmidt,* 123 Tex. 580, 72 S.W.2d 899, 904 (1934); *Ochoa v. Winerich Motor Sales Co.,* 127 Tex. 542, 94 S.W.2d 416, 421 (1936). See also my concurring opinion in *Collins v. Gladden,* 466 S.W.2d 629, 637 (Tex.Civ.App.—Beaumont 1971, writ ref'd n. r. e.).

Consequently, it would be an exercise in futility to file a dissent in this cause; and, an articulation of the reasons prompting such dissent would lend nothing to the jurisprudence of this state. Thus, while I do not file a dissent to the affirmation of the judgment, neither do I concur in the affirmation of the monetary award in this cause. Although I have participated in the disposition of this cause, I dissociate myself from the result reached by the majority.